IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 16-00033-01-CR-W-DW |
| ) | |
| BRITANY M. KLINE, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant's Motion to Dismiss the Indictment Due to Government's Failure to Preserve Potentially Exculpatory Evidence (doc #15). Specifically, defendant argues that her due process rights were violated because the government secured only the video recordings from two internal bank surveillance cameras and failed to secure video recordings from other bank surveillance cameras. (Id. at 1) For the reasons set forth below, it is recommended that defendant's motion to dismiss be denied.

I. INDICTMENT

On February 3, 2016, the grand jury returned a four count indictment against defendant Britany M. Kline. Counts One and Two of the indictment charge defendant with embezzlement by a bank officer ($6,000.00 on December 10, 2013 (Count One) and $6,200.00 on December 16, 2013 (Count Two)). Counts Three and Four charge defendant with taking money in the custody of a bank ($6,000.00 on December 10, 2013 (Count Three) and $6,200.00 on December 16, 2013 (Count Four)).

The Background and Embezzlement Scheme sections of the indictment read as follows:

## Background

1. UMB Bank is a financial institution with branches in the Western District of Missouri, whose deposits were and are insured by the Federal Deposit Insurance Corporation.

2. Britany Kline was an Operations Manager at the UMB Bank branch located at 760 Arnold Avenue, Building 550, Whiteman Air Force Base, Missouri. By virtue of her position as an officer and employee of UMB Bank, Kline owed the bank a fiduciary duty to act in the best interests of the bank and its depositors at all times. Kline's employment with the bank ended January 1, 2014.

## Embezzlement Scheme

3. On December 10, 2013 at 14:42:35, Kline purchased $6,000.00 in one hundred dollar bills from the bank's vault using a Teller Trade

4. On December 10, 2013 at 14:42:48 Kline reversed the aforementioned Teller Trade out of her journal.

5. At the end of that same business day, Kline completed a final balance of her cash drawer, reporting only a $1.00 overage, and then left the bank with the $6,000.00 she had removed from the vault.

6. Kline never returned the $6,000.00 to the bank.

7. During an interview with Special Agent Warren Gilpin on January 3, 2014, Kline admitted that the next morning (December 11, 2013) she was aware that she was out of balance by at least $6,000.00 but failed to research the issue.

8. On December 16, 2013 at 15:32:34, Kline processed a $2,200.00 Miscellaneous Debit using a valid bank customer's account number.

9. On December 16, 2013 at 16:25:15, Kline reversed the Miscellaneous Debit out of her journal.

10. On December 16, 2013 at 16:25:25, Kline processed a $6,200.00 Miscellaneous Debit to that same customer's account.

11. No paperwork supporting the $6,200.00 transaction was ever processed.

12. At the end of that same business day, Kline completed a final balance of her cash drawer, indicating she was in balance, and then left the bank with $2,200.00 in cash taken from her drawer.

2

13. Kline never returned the $2,200.00 to the bank.

14. A reconstruction of the cash drawer on that date resulted in a shortage of $2,200.00 in one hundred dollar bills and $4,000.00 in fifty dollar bills.

15. On December 16, 2013, Kline made two cash deposits into her personal checking account at the bank totaling $900.00 ($500.00 in hundred dollar bills and $400 in fifty dollar bills).

16. On January 23, 2014, Kline was interviewed by Cheryl Leyh, UMB Bank Investigator, and she admitted that she had taken $6,000.00 from the bank vault on December 10, 2013, but couldn't explain why she reversed the transaction out of her journal or why her cash drawer wasn't over by $6,000.00. She further admitted that she knew her cash In/Out tickets were out of balance by $6,000.00 the next morning, but she failed to research the problem or report the issue to her supervisor.

17. During that same interview, Kline couldn't explain why she posted the Miscellaneous Debit in her journal or failed to run any paperwork through the bank's system, as was standard protocol for that type of transaction.

18. The total amount embezzled was $12,200.00.

(Indictment (doc #1) at 1-3)

## II. THE EVIDENCE AT ISSUE

Defendant Kline has been provided with video recordings from two internal bank surveillance cameras. Video recordings from other bank surveillance cameras were not preserved. Cheryl Leyh, an internal investigator for UMB Bank, provided the following information regarding the video recordings:

1. There have been seven cameras at the UMB Bank Whiteman Air Force Base branch since July 24, 2012.

2. The camera positions and angles are the same today as they were in December 2013.

3. One camera records color footage that depicts the ATM located outside the bank building. That footage was not preserved.

4. There has never been a camera inside the bank vault or that depicts the vicinity of the bank vault.

3

5.      Two cameras are positioned above the front entrance doors. They both record color footage primarily of the bank lobby and children's play area. Of those two cameras, one depicts a panoramic view of the teller line in the background. The footage from that camera was turned over by the bank to the Secret Service. The footage from the other lobby camera was not preserved.[1]

        6.      There are four cameras that record black and white footage of each individual teller station which are mounted on the wall behind each of the four teller stations. Each camera depicts the respective teller station and the immediate vicinity where the customer stands as they transact their business. Each of these four cameras records all internal bank traffic occurring in and around the respective bank teller's station, the persons having access to the cash at that station, the conduct at that teller station, and all activity occurring in and around that teller station.

        7.      Of those four teller station cameras, the one positioned behind defendant Britany Kline's teller station was turned over by the bank to the Secret Service. The footage from the other three teller stations was not preserved.

(Affidavit in Support of Government's Response to Defendant's Motion to Dismiss the Indictment Due to Failure to Preserve Potentially Exculpatory Evidence (doc #17-1) at 1-2)

### III.  DISCUSSION

In United States v. Tyerman, 701 F.3d 552 (8th Cir. 2012), cert. denied, 133 S.Ct. 1849 (2013), the Eighth Circuit Court of Appeals discussed a defendant's due process rights with

---

[1] In its response to defendant's motion to dismiss, the government states that "[t]he second of those two cameras provided essentially the same vantage point, thus it had no potentially exculpatory value and was not preserved." (Government's Response (doc #17) at 2) Defendant argues that "if footage from one of the front entrance cameras was deemed relevant and preserved, it stands to reason that footage from the second entrance camera from 'essentially the same vantage point' was relevant and should have been preserved since the angle would have bene slightly different." (Defendant's Reply (doc #19) at 2-3) Despite the government's assertion that the two cameras provided essentially the same vantage point, Ms. Leyh's affidavit stated instead that "one depicts a panoramic view of the teller line in the background." It would appear that, based on Ms. Leyh's affidavit, the other camera focused on other areas of the bank lobby and children's play area. However, even if the second camera also depicted a panoramic view of the teller line in the background, the Court finds that while it would have been preferable if this evidence had been preserved, the failure to preserve it does not compel a finding of bad faith on the part of the government, given the production of the footage from the other camera from "essentially the same vantage point."

4

respect to the destruction of evidence. The court stated:

> A due process violation arises from destruction of evidence when the evidence "possess[es] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." California v. Trombetta, 467 U.S. 479, 489 (1984). A higher standard of proof applies, however, when the evidence is only potentially useful to the defendant. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988).

Tyerman, 701 F.3d at 560.

Defendant Kline argues that Trombetta applies because "footage from the internal bank surveillance cameras would be the *best evidence* of who accessed the teller stations and was potentially responsible for taking any allegedly missing money. Thus, the exculpatory value of video footage from every internal bank surveillance camera position is readily apparent." (Defendant's Motion to Dismiss (doc #15) at 5) According to defendant, when the Secret Service was provided with footage from only two camera positions, they should have identified, obtained and preserved video footage from the remaining camera positions within the bank. (Id.)

Contrary to defendant's argument, the Court finds that the exculpatory value of video footage from every internal bank surveillance camera position is not apparent. See United States v. Bohl, 25 F.3d 904, 910 (10th Cir. 1994)("To invoke Trombetta, a defendant must demonstrate that the government destroyed evidence possessing an "apparent" exculpatory value.") The money was missing from defendant Kline's cash drawer. The government has provided defendant with video from the camera positions that would show defendant Kline's individual teller station and the teller line.[2] The video of defendant Kline's individual teller station certainly

---

[2]In her reply brief, defendant argues that "at least two other tellers had access to the cash in defendant's teller drawer on December 10, 2013, when the two employees removed the cash tray

5

would appear to be the most relevant video evidence of what went on at that station and in that drawer.  The video that shows a panoramic view of the teller line would show another angle of activity at defendant Kline's teller station.   The remaining videos, of the ATM located outside the bank building, of the bank lobby and children's play area and of the three other teller stations, would not appear to possess "apparent" exculpatory value as to activity that is alleged to have taken place at defendant Kline's individual teller station.

In the alternative, defendant Kline argues "[i]f, however, the Court determines that the destroyed video footage constitutes 'potentially useful evidence,' as opposed to evidence possessing 'apparent exculpatory value,' Defendant is still entitled to relief under *Youngblood*." (Defendant's Motion to Dismiss (doc #15) at 6)   Under <u>Youngblood</u>, defendant argues the indictment should be dismissed because the Secret Service agents acted in bad faith when they failed to obtain and preserve video footage from each of the internal bank surveillance camera positions because the agents' training would have alerted them to the potential of exculpatory evidence from each of the camera positions.   (Defendant's Motion to Dismiss (doc #15) at 6-7) In her reply brief, defendant argues that each of the four camera angles for the teller stations recorded potentially exculpatory activity.   (Defendant's Reply (doc #19) at 1)

Defendant sets forth five factors which have been cited by the Tenth Circuit as relevant to

---

from the teller drawer at Ms. Kline's teller station and placed the cash tray in the bank vault. Likewise, all tellers had access to cash held within Ms. Kline's assigned cash drawer located within the bank vault."   (Defendant's Reply (doc #19) at 2)   The video footage of defendant's Kline's individual teller station should show all activity occurring at that teller station, including other employees who accessed the cash tray from the teller drawer at defendant Kline's teller station.   Thus, defendant should have the video footage she needs to substantiate her claim that at least two other tellers had access to the cash in defendant's teller drawer.   As for activity taking place in the vault, "[t]here has never been a camera inside the bank vault or that depicts the vicinity of the bank vault."   (Affidavit of Cheryl Leyh (doc #17-1) at ¶ 4)   Thus, there was no video evidence to preserve with respect to activity in and around the vault area.

6

the bad faith determination:

> 1) Did the government have explicit notice that defendant believed the video footage from each of the internal bank surveillance camera positions was exculpatory?
>
> 2) Is defendant's claim that this evidence is potentially exculpatory conclusory, or is it instead backed up with objective, independent evidence giving the government reason to believe that further tests on the destroyed evidence might lead to exculpatory evidence?
>
> 3) Did the government still have the ability to control the disposition of the evidence at the time defendant indicated that the evidence might be exculpatory?
>
> 4) Was the evidence disposed of central to the case?
>
> 5) Does the government offer any innocent explanation for its failure to preserve the evidence?

United States v. Beckstead, 500 F.3d 1154, 1159-61 (10th Cir. 2007), cert. denied, 552 U.S. 1304 (2008). (See Defendant's Motion to Dismiss (doc #15) at 6-7)  As set forth in Beckstead, the defendant bears the burden of establishing that the government acted in bad faith.  Beckstead, 500 F.3d at 1159.

With respect to the first factor, the Court has been provided with no information that defendant gave notice to the government that she believed the video footage from each of the internal bank surveillance camera positions was exculpatory, other than the filing of the instant motion on June 30, 2016.  Thus, there is nothing to indicate that the government destroyed the evidence in the face of a request from defendant Kline to preserve it.  With respect to the second factor, the Court finds defendant's arguments to be conclusory.  Defendant does not point to any other, independent evidence that would suggest that the video footage from other bank surveillance camera positions might lead to exculpatory evidence.  With respect to the third factor, it appears that the evidence was destroyed before defendant raised the possibility that it was

exculpatory. With respect to the fourth factor, it does not appear that the video footage from the bank surveillance camera positions which was destroyed was relevant to the activities that occurred at defendant Kline's individual teller station, let alone central to the case. With respect to the fifth factor, the government states that it only preserved video recordings from those cameras which had vantage points that portrayed the vicinity in which the alleged crimes occurred, clearly an innocent explanation for the failure to preserve all video recordings from the dates in question. Considering these five factors, the Court concludes that the government did not act in bad faith when it failed to obtain and preserve video footage from each of the internal bank surveillance camera positions.

Defendant's due process rights were not violated by the government's failure to preserve video footage from each of the internal bank surveillance camera positions.

III. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Dismiss the Indictment Due to Government's Failure to Preserve Potentially Exculpatory Evidence (doc #15).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve timely objections shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

*/s/ Sarah W. Hays*
SARAH W. HAYS
UNITED STATES MAGISTRATE JUDGE
